[No. 1289.]

# RENO SMELTING, MILLING AND REDUCTION WORKS, A CORPORATION, RESPONDENT, v. C. C. STEVENSON, ET AL., APPELLANTS.

ADOPTION OF COMMON LAW—APPLICABILITY OF—STATUTE CONSTRUED—INTENT OF LEGISLATURE.—The term "common law of England" was employed in the statute adopting it, (Gen. Stat. 3021) in the sense it is generally understood in this country, and the intention of the legislature was to adopt only so much of it as was applicable to our condition.

IDEM — WATER RIGHTS — RIPARIAN RIGHTS NOT APPLICABLE — PRIOR APPROPRIATION. — Held, that the common-law doctrine of riparian rights is unsuited to the condition of this state, and that this case should have been determined by the application of the principles of prior appropriation. (Jones v. Adams, 19 Nev. 78, overruling Vansickle v. Haines, 7 Nev. 249, affirmed.)

APPEAL from the District Court of the State of Nevada. Washoe County.

R. R. BIGELOW, District Judge.

The facts are sufficiently stated in the opinion.

John F. Alexander, Attorney General, Robert H. Lindsay and Thomas H. Wells, for Appellants:

I. The judgment and decree rendered herein should be reversed. It is not supported by the allegations of the complaint. The complaint bases plaintiff's right to recover in any event, either upon its legal or equitable cause of action, upon a prior appropriation of the waters of the Truckee river, and there is no allegation in said complaint which justified a decree based upon riparian ownership. (Boggs v. Merced M. Co., 14 Cal. 356; Gregory v. Nelson, 41 Cal. 278; Lothian v. Wood, 55

·Cal. 164; *Foster* v. *Goddard*, 1 Black. 506; *Grosholz* v. *Newman*, 21 Wall. 481.)

II. The quantity of water to which the appropriator is ·entitled is measured by his means of appropriation, as applied to the natural existing state of the stream, and the configuration of the ground through and over which it runs. (Gould Wat., Sec. 231; *Ophir S. M. Co.* v. *Carpenter*, 6 Nev. 393; *Carothers* v. *Pemberton*, 1 Mon. 111.) The law of appropriation has never recognized the right of the appropriator to make a dam out of the stream itself. The gist of all the cases on the .subject is that the appropriator acquires a usufruct in such water as by artificial means and appliances he diverts or appropriates from the stream, to some beneficial use. In this case it is the water brought to the reduction works and used in running the machinery that is appropriated, and no part of the water remaining in the stream is or can be by any pretense appropriated to the use of respondent.

III. The common law of England must be understood as having been adopted only in cases where it is applicable to the habits and conditions of our society, and in harmony with the genius, spirit and objects of our institutions. (1 Kent's Com., 472, 536; *State* v. *Calvin*, Charl. (Ga.) 166; *Wilford* v. *Grant*, Kirby, (Conn.) 114; *Barlow* v. *Lambert*, 28 Ala. 704; 65 Am. Dec. 374; *Boyer* v. *Sweet*, 3 Scam. 120; *Stuart* v. *People*, 3 Scam. 404; *Penny* v. *Little*, 3 Scam. 301; *Poultney* v. *Ross*, 1 Dall. 238; *Seeley* v. *Peters*, 5 Gilman, 150; *Shewell* v. *Fell*, 3 Yeates 17; *Lindsley* v. *Coats*, 1 Ohio, 243; *Carson* v. *Blazer*, 2 Binn. 475; 4 Am. Dec. 463; *Shrunk* v. *Schuylkill N. Co.*, 14 S. & R. 71; *Morgan* v. *King*, 30 Barb. 9; *Wagner* v. *Bissell*, 3 Iowa, 396; *Norris* v. *Harris*, 15 Cal. 226; *Le Barron*, v. *Le Barron*, 35 Vt. 365; *United States* v. *Worrall*, 2 Dall. 384; *Sackett* v. *Sackett*, 8 Pick. 309; *McClintock* v. *Bryden*, 5 Cal. 100; 63 Am. Dec. 87; *People* v. *Canal Appraisers*, 33 N. Y. 482; *Ex-parte Blanchard*, 9 Nev. 105; *Evans* v. *Cook*, 11 Nev. 74; ·Clark v. *Clark*, 17 Nev. 128.)

IV. We base our argument on the right to make a reasonable use of water without a damage to either party. Plaintiffs are appropriators, and their act shows that in this case to confine them to the rights riparian would prevent beneficial use by them of the water needed at their works. We have the same ˙rights they have. .They have measured their appropriation, ˙and they have constructed their works, and they are not capa-

ble of taking up so much water as they have appropriated and make a reasonable and beneficial use of it, and we claim the right to come in and make beneficial use of that which goes practically to waste. The dam constructed by plaintiff is not on land owned by plaintiff. Appropriation is the law governing the question of water rights in this state. Appropriation means for a reasonable and beneficial purpose. This water may be turned and diverted from its natural channel, and the actual taking and use measures the rights and determines the rights of others. (*Heath* v. *Williams*, 25 Me. 209; 43 Am. Dec. 265; *Mason* v. *Hill*, 5 B. & Ad. 27; *Liggins* v. *Inge*, 7 B. & Cr. 682; *Sampson* v. *Hoddinott*, 1 C. B. N. S. 590; *Embry* v. *Owen*, W. H. & G. 6 Exch. 370; *Northam* v. *Hurley*, 1 El. & Bl. 673; *Miner* v. *Gilmour*, 12 Moore P. C. 156; *Wood* v. *Waud*, W. H. & G. 3 Exch. 781; Godd. Eas. 300, 307; *Hill* v. *Le Normand*, Ariz., Jan. 1888; 16 Pac. Rep. 266; *Kaler* v. *Campbell*, 13 Or. 596; *Red River R. Mills* v. *Wright*, 30 Minn. 252; 44 Am. Rep. 194; *Yunker* v. *Nichols*, 1 Col. 551; *L. G. M. Co.* v. *Blake*, 24 Fed. Rep. 249; *Rogers* v. *Bruce*, 17 Pick. 184; *Union M. & M. Co.* v. *Ferris*, 2 Saw. 176; 27 Law Library, 21.)

*R. S. Mesick*, for Respondent:

I. The findings of fact made and conclusions drawn by the district court and the judgment entered are fully supported by the pleadings in the case. As against a mere intruder it is sufficient for a plaintiff to allege mere possession under claim of right. (Ang. Wat. Cour. Sec. 407.) The defendants are mere intruders.

In the case made by the complaint no occasion existed for relying upon or stating any particular title in plaintiff. The character of plaintiff's title could only be material as against one claiming by virtue of some right in himself in a contest between two as to which had the better right. But the allegation of ownership and possession is sufficient under all precedents to let in proof of any and all titles which the plaintiff may possess, whether arising from riparian ownership alone, or from such ownership with use, or from appropriation and use alone without any ownership in the land through which the stream flows. (Ang. Wat. 760-768; *Parker* v. *Griswold*, 17 Conn. 288; 42 Am. Dec. 739; 2 Chit. Pl. 628.) The use of the full

flow of the stream by a riparian owner is an incident to the land as much as are the stones or trees or metalliferous rock thereon.

II.   The right of the plaintiff to the undiminished water power, which it had created by its dam under the purchase of the right to build and maintain it from the owners of both banks of the stream, is as perfect, it seems to us, as against the claims of these defendants, as would be the power of steam or of electricity gathered and stored by it for present and future use.

III.   The plaintiff is engaged in a laudable and lasting pursuit at the point of controversy, having fortified itself with such titles to lands and easements upon the banks of the stream as enabled it to control the entire stream *at that place* without intruding upon the rights of any one.   These easements so owned give plaintiff an interest in the *whole bed of the stream at that place and in the banks* for the distance of three hundred feet above the dam structure, sufficient to make good its allegation of ownership and possession of its mill dam, whether or not the term mill dam be held to mean merely the artificial structure or the pond of water raised by the dam structure and the banks of the stream containing it. (*Colwell* v. *May's W. P. Co.,* 19 N. J. Eq. 245; *Hutchinson* v. *Chicago & N. R. Co.,* 37 Wis. 604.)

IV.   Appellants asseverate that, notwithstanding the words of the statute book of the state and the decisions of this court to the contrary, the common law of England does not prevail in the state of Nevada in reference to the subject of water rights, but that the subject had, by some process, passed under the dominion of something called the common law of the Pacific coast.   Just what appellants mean by the phrase common law of the Pacific coast, they have not made clear.   But we are prepared to maintain that there is no law to be found upon the statute books of either the United States or of any state, nor any decision of their courts, which lends any support whatsoever to the idea that the owner of a fee simple title to land, through which flows a stream of water not appropriated while the land was part of the public domain, is lawfully subject, except by the right of eminent domain or his own fault, to the loss of any portion of that stream upon his own land and against his will, whether he have immediate use for it or not. *Heath* v. *Williams,* 25 Me. 209; 43 Am. Dec. 279-80; Const. of Nevada, Art. XVII, Sec. 2; *Vansickle* v. *Haines,* 7 Nev. 249.)

By the Court, BELKNAP, J.:

This action is brought for the purpose of determining rights to the use of water upon the following facts: The plaintiff is a corporation engaged in the reduction of ores. It is the owner in fee of ten acres of land on the Truckee river, upon which its reduction works are situated. Long prior to the commission of the grievances alleged in the complaint, it built a dam in the river at a point above its own land, but with the consent of those whose lands were affected thereby. The water is used to furnish power to operate machinery at the works, and is conveyed from the dam by means of a ditch and flume. The height of the dam is such that the waters of the river flow over it about ten inches above its crest, and, unless the water is maintained at this height, sufficient cannot be diverted to fill the ditch and flume. The state of Nevada is the owner in fee of the land next below that of the plaintiff on the river. The insane asylum of the state is situated thereon, and the defendants, by virtue of their offices of governor, controller, and treasurer of the state, respectively, are commissioners for the care of the insane, and as such, control the affairs of the asylum. In their capacity as commissioners they have caused the pond of water made by the dam of the plaintiff to be tapped by a flume, and thereby carried a portion of the waters to the asylum grounds for motive power. The district court enjoined this diversion of the waters. Plaintiff upon this appeal neither claims nor disclaims a right by virtue of a prior appropriation, but urges an affirmance of the judgment upon the sole ground that it is a riparian proprietor, and, as such, is entitled to the natural flow of the water through its land.

The rights of riparian proprietors are thus stated by Chancellor Kent: "Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands as it was wont to run (*currere solebat,*) without diminution or alteration. No proprietor has the right to use the water, to the prejudice of other proprietors above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. *Aqua currit et debet currere ut currere solebat,*

is the language of the law. Though he may use the water while it runs over his land as an incident to the land, he cannot reasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors, he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above, without a grant, or an uninterrupted enjoyment of twenty years, which is evidence of it." (3 Kent. Comm. 439.) "It is wholly immaterial," says Judge Story, in *Tyler* v. *Wilkinson*, 4 Mason, 400, "whether the party be a proprietor above or below, in the course of the river. The right being common to all the proprietors on the river, no one has a right to diminish the quantity which will, according to the natural current, flow to a proprietor below, or to throw it back upon a proprietor above. This is the necessary result of the perfect equality of right among all the proprietors of that which is common to all." But the rule of the common law has never been applied by the courts of this state, except as hereinafter mentioned. The condition of settlers upon the public lands of the state necessitated a diversion of running waters from their natural channels for agricultural purposes, and our courts have, with the exception stated, protected the first appropriator to the extent of his appropriation to any beneficial use, and no obligation has been imposed upon him to return the water to its natural channel. The history of this subject is clearly stated by Mr. Justice Field, in *Atchison* v. *Peterson*, 20 Wall. 510, as follows: "By the custom which has obtained among miners in the Pacific states and territories, where mining for the precious metals · is had on the public lands of the United States, the first appropriator of mines, whether in placers, veins, or lodes, or of waters in the streams on such lands for mining purposes, is held to have a better right than others to work the mines or use the waters. The first appropriator who subjects the property to use, or takes the necessary steps for that purpose, is regarded, except as against the government, as the source of title in all controversies relating to the property. As respects the use of water for mining purposes, the doctrines of the common law, declaratory of the rights of riparian owners, were, at an early day, after the discovery of gold, found to be inapplicable, or applicable only in a very limited extent, to the

necessities of miners, and inadequate to their protection." Re-ferring to the rule as above stated, and which accords to the different riparian proprietors, an equal right to the use of the waters of the stream, the opinion proceeds: "This equality of right among all the proprietors on the same stream would have been incompatible with any extended diversion of the water by one proprietor, and its conveyance for mining purposes to points from which it could not be restored to the stream. But the government being the sole propri;tor of all the public lands; whether bordering on streams or otherwise, there was no occasion for the application of the common law doctrine of riparian proprietorship with respect to the waters of those streams. The government, by its silent acquiescence, assented to the general occupation of the public lands for mining, and, to encourage their free and unlimited use for that purpose, reserved such lands as were mineral from sale, and the acquisi-tion of title by settlement. And he who first connects his own labor with property thus situated and open to general explora-tion does, in natural justice, acquire a better right to its use and enjoyment than others who have not given such labor. So the miners on the public lands throughout the Pacific states and territories by their customs, usages and regulations every-where recognized the inherent justice of this principle, and the principle itself was at an early period recognized by legislation, and enforced by the courts in those states and territories." And in *Basey* v. *Gallagher*, 20 Wall. 670, after referring to the views above quoted, the court say: "The views there expressed and the rulings made, are equally applicable to the use of waters on the public lands for purposes of irrigation. No distinction is made in those states or territories by the customs of miners or settlers, or by the courts, in the rights of the first appropriator from the use made of the water if the use be a beneficial one." In the case of *Vansickle* v. *Haines*, 7 Nev. 249, it was held that the patentee of the government succeeded to all its rights, and among these was the right to have the water of a stream theretofore diverted returned to its natural channel. In that case the patent of the government had been issued prior to the passage of the act of Congress of July 26, 1866. The court considered the statute prospective in its nature, and that it did not apply to that patent. Subsequently, in the case of *Broder* v. *Natoma Water etc., Co.*, 101 U. S. 274, the Supreme Court of the

United States declared that the statute was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one; and, following this view, the construction given to the statute in *Vansickle* v. *Haines* was overruled in *Jones* v. *Adams*, 19 Nev. 78, 3 Am. St. Rep. 788. Again, in *Vansickle* v. *Haines*, the court considered the language of the statute adopting the common law precluded a consideration of the question of its applicability. The statute is as follows: "The common law of England, so far as it is not repugnant to or in conflict with the constitution and laws of the United States, or the constitution and laws of this state, shall be the rule of decision in all the courts of this state." (Gen. Stat. 3021.) This was substantially the statute when *Vansickle* v. *Haines* was decided. The statute is silent upon the subject of the applicability of the common law, but we think the term "common law of England" was employed in the sense in which it is generally understood in this country, and that the intention of the legislature was to adopt only so much of it as was applicable to our condition. An examination of the authorities will render this apparent.

In Curtis' Comm., Sec. 16, the author says: " *   *   * It is to be observed that the common law of England was adopted by the founders of the American colonies to a limited extent only. The emigrants from England brought with them the general principles of the common law of that country, and adopted and put them in practice, so far as they were applicable to their situation; and, as the people of each colony acted independently of the rest in this respect, it has resulted that the common law of each of the states differs in some particulars from that of the others, and that in none of them is it wholly identical with the common law of England." Professor Washburn, in his treatise upon the Law of Real Property (vol. 1, 36,) says: "   *   *   * It may be well to understand how far the common and statute law of England have been adopted as the law of this country. As a general proposition, so much of these as was suited to the condition of a people like that of the early settlers of this country was adopted by common consent as the original common law of the colonies. They brought it with them as they did their language, and regarded it as a heritage of inestimable value, by which their rights of person and property were to be regulated and secured. Especially was this

true in regard to the law of real property." "The common law of England," said Judge Story, "is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright, but they brought with them and adopted only that portion which was applicable to their situation." (*Van Ness* v. *Packard*, 2 Pet. 144.) "The common law," says Chancellor Kent, "so far as it is applicable to our situation and government, has been recognized and adopted as one entire system by the constitutions of Massachusetts, New York, New Jersey, and Maryland. It has been assumed by the courts of justice, or declared by statute, with the like modifications, as the law of the land in every state. It was imported by our colonial ancestors as far as it was applicable. * * *" (1 Kent. Comm. 473.)

In *Bogardus* v. *Trinity Church*, 4 Paige, 198, the question was whether the statute of 32 Hen. VIII, and that of 21 James I, constituted a part of the law of the state of New York. Chancellor Walworth said: "It is a natural presumption, and therefore adopted as a rule of law, that, on the settlement of a new territory by a colony from another country, especially where the colonists continue subject to the same government, that they carry with them the general laws of the mother country, which are applicable to the situation of the colonists in the new territory; which laws thus become the laws of the colony until they are altered by the common consent or by legislative enactment. * * * The common law of the mother country, as modified by positive enactments, together with the statute laws which are in force at the time of the emigration of the colonists, become in fact the common law rather than the common and statute law of the colony. The statute law of the mother country, therefore, when introduced into the colony of New York by common consent because it was applicable to the colonists in their new situation, and not by legislative enactment, became a part of the common law of this province." And the rules of the common law are not enforced in localities to which they are inapplicable. In Illinois it was held that the rule of the common law requiring the owner of cattle to keep them upon his own land was inapplicable. The court said: "However well adapted the rule of the common law may be to a densely populated country like England, it is surely but ill adapted to a new country like ours. If this common-law rule prevails now

it must have prevailed from the time of the earliest settlements in the state; and can it be supposed that, when the early settlers of this country located upon the borders of our extensive prairies, they brought with them and adopted as applicable to their condition a rule of law requiring each one to fence up his cattle; that they designed the millions of fertile acres stretched out before them to go ungrazed, except as each purchaser from government was able to enclose his part with a fence? This state is unlike any other of the eastern states in their early settlement, because, from the scarcity of timber, it must be many years yet before our extensive prairies can be fenced, and their luxuriant growth, sufficient for thousands of cattle, must be suffered to rot and decay where it grows, unless the settlers upon their borders are permitted to turn their cattle upon them. Perhaps there is no principle of the common law so inapplicable to the condition of our country and people as the one which is sought to be enforced now for the first time since the settlement of the state. It has been the custom in Illinois so long that the memory of man runneth not to the contrary, for the owners of stock to suffer them to run at large. Settlers have located themselves contiguous to prairies for the very purpose of getting the benefit of the range. The right of all to pasture their cattle upon uninclosed ground is universally conceded. No man has questioned this right, although hundreds of cases must have occurred where the owners of cattle have escaped the payment of damages on account of the insufficiency of the fences through which their stock have broken, and never till now has the common-law rule, that the owner of cattle is bound to fence them up, been supposed to prevail or to be applicable to our condition. The universal understanding of all classes of the community, upon which they have acted by inclosing their crops and letting their cattle run at large, is entitled to no little consideration in determining what the law is; and we should feel inclined to hold, independent of any statutes upon the subject, on account of the inapplicability of the common-law rule to the condition and circumstances of our people, that it does not, and never has prevailed in Illinois." (*Seeley* v. *Peters*, 5 Gil. 142.)

When that case was decided a statute of the state was in force adopting the common law "so far as the same is applicable, and of general nature." No mention of this qualification is made in the opinion. The court appears to have assumed its

existence independently of express enactment, because in the year 1841, before the legislature had annexed the qualification to the statute, the court, in *Boyer* v. *Sweet*, 3 Scam. 120, said: "It is true, we have, like most other states in the Union, adopted the common law by legislative act; but it must be understood only in cases where that law is applicable to the habits and conditions of our society, and in harmony with the genius, spirit, and objects of our institutions." In the case of *People* v. *Canal Appraisers*, 33 N. Y. 461, the question was whether the common-law rule of evidence to determine whether streams are navigable was applicable in the State of New York. In discussing the subject, the court adopted the views expressed by Judge Bronson, in a dissenting opinion, in *Starr* v. *Child*, 20 Wend. 149, as follows: "By the common law, the flow and reflow of the tide is the criterion for determining what rivers are public. This rule is open to the double objection that it includes some streams which are not in fact navigable, and which, consequently, might well be the subject of individual ownership; and it excludes other streams, which are in fact navigable, and which in every well regulated state should belong to the public. Although the ebb and flow of the tide furnishes an imperfect standard for determining what rivers are navigable, it nevertheless approximates the truth, and may answer very well in the island of Great Britain, for which the rule was made. But such a standard is quite wide of the mark when applied to the great fresh-water rivers of this continent, and would never have been thought of here, if we had not found the rule ready made at our hands. Now, I think no doctrine better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes, not only such laws as are inconsistent with the spirit of our institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a law when that reason utterly fails—*cessante ratione legis, cessat ipsa lex.*" In states where the common law has not been adopted by legislative enactment, courts have proceeded upon the hypothesis of its adoption, subject, always, to its applicability to the locality. (*Stout* v. *Keyes*, 2 Doug. (Mich.) 184, 43 Am. Dec. 465; *Lorman* v. *Benson*, 8 Mich. 18; 77 Am. Dec. 435; *Morris* v.

*Vanderen*, 1 Dall. 67; Report of Judges, 3 Binn. 595; *Shewel* v. *Fell*, 3 Yeates 21; *Flanagan* v. *Philadelphia*, 42 Pa. St. 219; *State* v. *Cawood*, 2 Stew. (Ala.) 360; *Inge* v. *Murphy*, 10 Ala. 885 )

From these authorities we assume that the applicability of the common-law rule to the physical characteristics of the state should be considered. Its inapplicability to the Pacific states, as shown in *Atchison* v. *Peterson, supra,* applies forcibly to the state of Nevada. Here the soil is arid, and unfit for cultivation unless irrigated by the waters of running streams. The general surface of the state is table land, traversed by parallel mountain ranges. The great plains of the state afford natural advantages for conducting water, and lands otherwise waste and valueless become productive by artificial irrigation. The condition of the country, and the necessities of the situation, impelled settlers upon the public lands to resort to the diversion and use of waters. This fact of itself is a striking illustration, and conclusive evidence of the inapplicability of the common-law rule. The system which the necessities of the people established was recognized and confirmed by the legislation of Congress—*first,* by the act of July 26, 1866, which declares, in its ninth section, "that whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; * * *" and, *second,* by the desert land act, which encourages the appropriation and use of water upon such of the public lands as will not, without irrigation, produce an agricultural crop, by authorizing the sale of a greater amount of such land than the purchaser could otherwise acquire, upon proof of his having conducted water upon it for the purpose of irrigation. This act applies only to the Pacific coast states and territories. (U. S. Stat. 1877, 377.) The legislation of the state also has encouraged the diversion of water by an act approved March 3, 1866, the general object of which is expressed in its title as follows: "An act to allow any person or persons to divert the waters of any river or stream and run the same through any ditch or flume, and to provide for the right of way through the lands of others."

(Gen. Stat. 362-365.) And the adjudication of the courts, with the exception mentioned, have sustained the doctrine of appropriation upon which the people acted. That the doctrine should be upheld, as well after the issuance of the patent of the government as before, we quote the views of Mr. Justice Ross, in a dissenting opinion in *Lux* v. *Haggin*, 69 Cal. 450: "The doctrine of appropriation thus established was not a temporary thing, to exist only until some one should obtain a certificate or patent for forty acres, or some other subdivision of the public land bordering on the river or other stream of water. It was, as has been said, born of the necessities of the country and its people, was the growth of years, permanent in its character, and fixed the *status* of water rights with respect to public lands. . No valid reason exists why the government, which owned both the land and the water, could not do this. It thus became, in my judgment, as much a part of the law of the land as if it had been written in terms in the statute books, and in connection with which all grants of public land from either government should be read. In the light of the history of the state, and of the legislation and decisions with respect to the subject in question, is it possible that either government, state or national, ever contemplated that conveyance of forty acres of land at the lower end of the stream that flows for miles through public lands should put an end to subsequent appropriation of the waters of the stream upon the public lands above, and entitle the grantee of the forty acres to the undiminished flow of the water in its natural channel from its source to its mouth? It seems to me entirely clear that nothing of the kind was ever intended or contemplated." The case of *Coffin* v. *Left Hand Ditch Co*, 6 Colo. 443, recognizes appropriation as the law of the state of Colorado. Some of the principles announced in that case are applicable here. "It is contended by counsel for appellants," say the court, "that the common law principles of riparian proprietorship prevailed in Colorado until 1876, and that the doctrine of priority of right to water by priority of appropriation thereof was first recognized and adopted in the constitution. But we think the latter doctrine has existed from the date of the earliest appropriations of water within the boundaries of the state. The climate is dry, and the soil, when moistened only by the usual rainfall, is arid and unproductive. Except in a few favored sections, artificial irri-

gation, for agriculture, is an absolute necessity. Water in the various streams thus acquires a value unknown in moister climates. Instead of being a mere incident to the soil, it arises, when appropriated, to the dignity of a distinct usufructuary estate or right of property. It has always been the policy of the national, as well as the territorial and state governments, to encourage the diversion and use of water in this country for agriculture; and vast expenditures of time and money have been made in reclaiming and fertilizing, by irrigation, portions of our unproductive territory.  *  *  *  The right to water in this country, by priority of appropriation thereof, we think it is, and has always been, the duty of the national and state governments to protect    The right itself, and the obligation to protect it, existed prior to legislation on the subject of irrigation. It is entitled to protection, as well after patent to a third party of the land over which the natural stream flows, as when such land is a part of the public domain, and it is immaterial whether or not it be mentioned in the patent, and expressly excluded from the grant." Our conclusion is that the common-law doctrine of riparian rights is unsuited to the condition of our state, and that this case should have been determined by the application of the principles of prior appropriation. Judgment reversed, and cause remanded for a new trial.