[Civil No. 988. Filed March 22, 1907.]

[89 Pac. 504.]

BOQUILLAS LAND AND CATTLE COMPANY, a Corporation, Plaintiff in Error, v. THE ST. DAVID CO-OPERATIVE COMMERCIAL AND DEVELOPMENT ASSOCIATION, a Corporation, et al., Defendants in Error.

1. WATERS AND WATERCOURSES — IRRIGATION — RIPARIAN OWNERS — COMMON LAW — NOT IN FORCE IN ARIZONA — BILL OF RIGHTS, ART. 22, AND HOWELL'S CODE, CHAP. 55, LEGISLATURE 1864.—Howell's Code adopted the common law of England so far as not repugnant to, or inconsistent with, the Bill of Rights or the laws of the territory, and the Bill of Rights, article 22, declared all streams susceptible to use for irrigation to be public property, and gave any inhabitant of the territory owning or possessing irrigable land the right to divert water necessary for irrigation from any convenient stream. *Held,* that the common-law doctrine that only riparian owners could divert water from streams for irrigation purposes, being repugnant to the Bill of Rights, article 22, has never obtained in this territory.

2. SAME.—RIGHTS UNDER COMMON LAW, EVEN IF EXISTENT, CONFERRED NO SUCH PROPERTY RIGHT AS MIGHT NOT BE ABROGATED.—Whether or not subsequent legislation can be construed as a recognition that the common law as to riparian rights was adopted by the statutes of 1864, Howell's Code, adopting the common law, any right granted by the statute was clearly not intended to become property in such a sense that it might not be abrogated by future legislation, when riparian owner has made no use of the water permitted him at common law.

3. SAME —TREATIES—EFFECT ON PROPERTY RIGHTS.—Rights under treaty are neither greater nor less than prior thereto. While, under the

treaty of Guadalupe Hidalgo, the owner of a Mexican land grant, title to which was vested at the date of the treaty, retained all vested rights of the property to which he was entitled under the laws of Mexico, and the legislature of Arizona has no power or authority to deprive any such owner of any such rights, at least without due compensation, yet the Mexican law in force at the time of the treaty above mentioned was such that the legislature could concede to individuals or corporations exclusive right to the uses of water of unnavigable streams, and the use of the waters of such streams being under legislative control under the Mexican law, the change of sovereignty merely transferred this right of control from Mexico to the United States, and hence Arizona, exercising power delegated to it by the United States, might grant common-law rights to a riparian owner or establish the right of prior appropriation, and grant this right to others than riparian owners.

ERROR to District Court, First Judicial District, in and for the County of Cochise. Fletcher M. Doan, Judge. Affirmed.

Affirmed *sub nom. Boquillas Land and Cattle Co. v. Curtis,* 213 U. S. 339, 53 L. Ed. 822.

The facts are stated in the opinion.

Eugene S. Ives, for Plaintiff in Error.

The so-called doctrine of appropriation or the acquiring of the right to the uses of waters by appropriation is wholly foreign to the common law and wholly inconsistent therewith. By the common law the appropriator could never be more than a trespasser, and could never acquire any rights by user, no matter for what length of time, as against the riparian owner. *Lux* v. *Haggin,* 69 Cal. 255, 10 Pac. 674. In some of the American authorities the common-law rights of riparian owner is held to include a reasonable use of water for purposes of irrigation, but such right must not substantially impair the rights of other riparian owners. *Meng* v. *Coffey,* 67 Neb. 500, 108 Am. St. Rep. 697, 93 N. W. 713, 60 L. R. A. 910; *Bathgate* v. *Irvine,* 126 Cal. 135, 77 Am. St. Rep. 158, 58 Pac. 442. Article 5 of the Gadsden treaty provides that the provisions of the eighth, ninth, sixteenth, and seventeenth articles of the treaty of Guadalupe Hidalgo shall apply to all rights of persons and property within the territory ceded. Rev. Stats. 1901. Article 8 of the treaty of Guadalupe Hidalgo provides that rights of property belonging to Mexi-

XI Ariz.—9

cans in the ceded territory shall be inviolable. Under the
provisions of section 8 of act of Congress of March 3, 1901,
establishing the court of private land claims, title to Mexican
land grants shall be confirmed whenever a title is shown to
exist and the issuance of a patent to the person in whom such
grant is confirmed. The effect of such provision as in the
above-named treaties has been construed by the United States
supreme court. Under these decisions the effect of a patent
issued by the proper officers of the United States to lands em-
braced within a confirmed Mexican land grant operates not
only as a quitclaim or conveyance of whatever interest the
United States may have in the lands, but also as a confirma-
tion and determination that title existed under such grant
at the time of the acquisition of the territory. The title thus
confirmed is the title as it existed at the time of the cession by
Mexico, and conclusively determines its existence both as
against the United States and as against third persons not
showing a superior right. The proceedings are but a con-
firmation of a title already existing. *Beard* v. *Federy,* 3
Wall. 478, 18 L. Ed. 88; *Knight* v. *United Land Assn.,* 142
U. S. 161, 35 L. Ed. 974; *Herrick* v. *Boquillas L. & C. Co.,*
200 U. S. 96, 26 Sup. Ct. 192, 50 L. Ed. 388, involving the
very lands described in the patent mentioned in the findings
of the court in this case. It follows, therefore, that the plain-
tiff in error and its predecessors in interest have been the
owners of lands described in the patent and in the findings
of the court in this case, since the date of the grant from the
government of Sonora, and that the title now claimed existed
at that time and at the date of the cession by Mexico under
the Gadsden treaty, and ever since, and whatever property
rights attached to such ownership at any time since the date
of the cession are inviolable, and whatever may have been the
subsequent legislation or the rights of parties under subse-
quently acquired titles, the rights of the plaintiff in error re-
main as they were prior to such legislation. It is well settled
that riparian rights once attaching or becoming a part of
lands are property rights, and cannot be taken away, and can
only be taken for a public use by the exercise of eminent
domain. *Crawford* v. *Hathaway,* 67 Neb. 325, 108 Am. St.
Rep. 647, 93 N. W. 781, 60 L. R. A. 889. And even a state
constitution cannot take away or impair riparian rights pre-
viously vested. *Bigelow* v. *Draper,* 6 N. D. 152, 69 N. W.
570, 573. Neither the Bill of Rights nor the provisions

in Howell's Code are to be construed as repugnant to the common-law doctrine of riparian rights, and which plaintiff in error contends was adopted as the law of this territory by the provision in Howell's Code adopting the common law. The prohibition of exclusive use in article 22, Bill of Rights, militates rather against the doctrine of appropriation or rights under priority of appropriation than otherwise; and as the rights of riparian proprietors include also the reasonable use of water for irrigation upon the riparian lands, it will be seen that article 22 is consistent and harmonious with the common-law doctrine on that subject. Long on Irrigation,. sec. 9.

Even though the doctrine of appropriation prevailed to· some extent in this territory, it could not affect the rights of the riparian proprietors claiming under Mexican grants. *Lux* v. *Haggin*, 69 Cal. 255, 10 Pac. 674. The subject of riparian rights under Mexican grants is discussed in Black's Pomeroy on Water Rights, section 43, in which the author, while rea-soning that the rights of an owner of a title by grant from the Mexican government do not differ in any respect from those held by any other proprietor, who derives his title from the United States, concludes that the question of priority between such a grantee and a person who has appropriated the waters of a stream before his grant was confirmed by the United States authorities must depend upon the legal effect given to the confirmation. If the confirmation relates back to the date of the treaty, so that the grantee is regarded as deriving his title directly and holding it continuously from the Mexican government, the rights of such grantee are superior to those of the appropriator; otherwise if the confirmation operates only from its own date.

Pickett & Bowman, and Ben Goodrich, for Defendants in Error. (Authorities cited by defendant in error well taken, but cited and fully covered and to same effect in opinion.)

SLOAN, J.—The plaintiff in error is the owner of a tract of land in Cochise county granted by the Republic of Mexico to Ignacio Gonzales and Nepomeceno Felix in the year 1833. The title to this tract of land was confirmed to the predecessors in interest of the plaintiff in error and successors in interest to the original grantees, by the court of private land claims, and, under the judgment of confirmance of said land

court, the patent of the United States issued to the predecessors in interest of the plaintiff in error in December, 1900. The San Pedro river runs through the land in a northerly direction. In 1877 the defendants in error, and certain other persons, entered upon the land of the plaintiff in error, constructed a dam across the San Pedro river, and diverted the water therefrom by means of a canal over and through portions of said land. The land irrigated by means of said canal in part constituted a portion of said land. The remainder, consisting of one hundred and twenty acres, lying north of the northern boundary of the land grant, is owned by the defendants in error. In the month of December, 1904, the defendants in error undertook to construct a new dam in place of the old one, which had been destroyed by a flood, and to rebuild portions of the ditch upon the land of plaintiff in error. No use of the water appropriated and taken from the San Pedro river by the defendants in error had been made by the plaintiff in error or its predecessors in interest prior to 1877. The latter began this action to restrain the defendants in error from entering upon its land for the purpose of constructing said dam and ditch and from diverting water from the San Pedro river off the said lands. After a trial on the merits, the court below gave judgment for the defendants in error. This judgment is attacked by the plaintiff in error upon the ground that the court, in recognizing the right of prior appropriation in the defendants in error, erred for two reasons: First, that by certain legislation of the territory of Arizona the common-law doctrine of riparian rights was at one time in force during the ownership of the land by the predecessors in interest of the plaintiff in error, and that such rights, having once attached, could not be taken away by subsequent legislation; second, that the plaintiff in error, claiming title under a Mexican land grant, subsequently confirmed, possesses all the right to the use of the water flowing through its land which its predecessors in interest had prior to the cession of that part of the territory lying south of the Gila river under the Gadsden Purchase, and that the doctrine of appropriation or priority of right by virtue of priority of appropriation was not in force under the laws of Mexico at the time of the cession.

The questions thus presented are historical as well as legal, and are of great interest. We will consider them in the order stated. As is well known, after the treaty of Guadalupe

Hidalgo and the organization of the territory of New Mexico and the subsequent cession under the Gadsden Purchase, the territory included within the present boundaries of Arizona constituted a part of New Mexico. The act of Congress creating the territory of Arizona continued in force the statutes of New Mexico until the legislature of the new territory should adopt its own laws. The first legislature of the new territory met in 1864. It adopted, among its first acts, what is historically known as the Howell Code. One of the provisions of the Howell Code read as follows: "The common law of England, so far as it is not repugnant to or inconsistent with the constitution and laws of the United States or the Bill of Rights or the laws of this territory, is hereby adopted and shall be the rule of decision in the courts of this territory." A section of the Bill of Rights referred to read as follows: "All streams, lakes and ponds of water capable of being used for the purpose of navigation or irrigation, are hereby declared to be public property, and no individual or corporation shall have the right to appropriate them exclusively to their own private use, except under such equitable regulations and restrictions as the legislature shall provide for that purpose." Article 22, Bill of Rights, Howell Code. Chapter 55 of the Howell Code contained the following provisions:

"All rivers, creeks and streams of running water in the territory of Arizona are hereby declared public, and applicable to the purposes of irrigation and mining, as hereinafter provided."

"All rights in acequias, or irrigating canals, heretofore established shall not be disturbed, nor shall the course of such acequias be changed without the consent of such established rights."

"All the inhabitants of this territory, who own or possess arable and irrigable lands, shall have the right to construct public or private acequias (canals), and obtain the necessary water for the same from any convenient river, creek or stream of running water."

"Whenever such public or private acequias (canals) shall necessarily run through the lands of any private individuals not benefited by said acequias, the damages resulting to such private individuals, on the application of the party interested, shall be assessed by the probate judge of the proper county in a summary manner."

"No inhabitant of this territory shall have the right to erect any dam, or build a mill, or place any machinery, or open any sluice, or make any dike, except such as are used for mining purposes, or the reduction of metals, as provided for in section 6 and 7 of this chapter, that may impede or obstruct the irrigation of any lands or fields, as the right to irrigate the fields and arable lands shall be preferable to all others; and the justices of the peace of the respective precincts shall hear and determine the questions relative to all such obstructions in a summary manner, and cause the removal of the same by order directed to the constable of the precinct or sheriff of the county, who shall proceed to execute the same without delay."

"When any ditch or acequia shall be taken out for agricultural purposes, the person or persons so taking out such ditch or acequia shall have the exclusive right to the water, or so much thereof as shall be necessary for said purposes, and if at any time the water so required shall be taken for mining operations, the person or persons owning said water shall be entitled to damages, to be assessed in the manner provided in section 6 of this chapter."

"During years when a scarcity of water shall exist, owners of fields shall have precedence of the water for irrigation, according to the dates of their respective titles or their occupation of the lands, either by themselves or their grantors. The oldest titles shall have precedence always."

"The regulations of acequias, which have been worked according to the laws and customs of Sonora and the usages of the people of Arizona, shall remain as they were made and used up to this day, and the provisions of this chapter shall be enforced and observed from the day of its publication."

The laws of New Mexico contained similar provisions on the subject of water, and in fact little or no change thereof was made or attempted by the Howell Code.

It is contended by counsel for plaintiff in error that neither the Bill of Rights nor the statutes above quoted are to be construed as repugnant to or inconsistent with the doctrine of riparian rights as recognized by the common law of England. In *Clough* v. *Wing*, 2 Ariz. 371, 17 Pac. 453, this court, speaking by Mr. Justice Barnes, said: "Up to about a third of a century ago, and but recently before this enactment [referring to the Howell Code] the territory of Arizona had been subject to the laws and customs of Mexico, and the common

law had been unknown; and that law has never been and is not now suited to conditions that exist here so far as the same applies to the uses of water.'' This decision has stood unchallenged for nearly twenty years. A review of the subject satisfies us that the view taken and expressed by Mr. Justice Barnes was sound. Both the Bill of Rights and the statutes quoted declare the water of streams capable of being used for the purpose of irrigation to be public property, and conferred upon any inhabitant of the territory who owned or possessed arable or irrigable land the right to construct ditches and obtain and divert thereby water necessary for such use from ''any convenient river, creek or stream of running water.'' The common law recognized no such right. On the contrary, the riparian owner was entitled to the full flow of the stream through his land, except as the flow might be affected by a reasonable use made thereof by other riparian owners. No one except the riparian owner had the right to divert any of the water from such stream. The statutes referred to make no distinction between the riparian owner and the owner of other land capable of being irrigated, although not crossed by or adjoining the stream. Other provisions of the statutes quoted are equally repugnant to the common-law doctrine of riparian rights.

As stated by the supreme court of Utah, in *Stowell* v. *Johnson,* 7 Utah, 215, 26 Pac. 290: ''At common law the riparian proprietor is entitled to have the water flowing, in quantity and quality, past his land as it was wont to do when he acquired title thereto, and this right is utterly irreconcilable with the use of water for irrigation.'' Similar declarations have been made by the supreme courts of Colorado, Nevada, and Wyoming. *Coffin* v. *Left-Hand Ditch Co.,* 6 Colo. 443; *Jones* v. *Adams,* 19 Nev. 79, 3 Am. St. Rep. 788, 6 Pac. 442; *Reno etc. Works* v. *Stevenson,* 20 Nev. 269, 19 Am. St. Rep. 364, 21 Pac. 317, 4 L. R. A. 60; *Willey* v. *Decker,* 11 Wyo. 496, 100 Am. St. Rep. 939, 73 Pac. 211. Even in those states where the common-law doctrine of riparian rights is applied, the impossibility of reconciling the common law with the right of appropriation is recognized. *Lux* v. *Haggin,* 69 Cal. 255, 10 Pac. 675. In the latter case, the court say: ''The doctrine of appropriation, so called, is not the doctrine of the common law.'' The statutes of Nevada adopted the common law of England in the following words: ''The common law of England, so far as it is not repugnant to, or in conflict

with, the constitution and laws of the United States, or the constitution and laws of this state, shall be the rule of decision in all the courts of this state.'' The supreme court of Nevada, in *Reno Smelting etc. Co.* v. *Stevenson,* 20 Nev. 269, 19 Am. St. Rep. 364, 21 Pac. 317, 4 L. R. A. 60, construing this statute in its application to riparian rights, said: ''The statute is silent upon the subject of the applicability of the common law, and we think the term 'common law of England' was implied in the sense in which it is generally understood in this country, and that the intention of the legislature was to adopt only so much of it as was applicable to our condition. An examination of the authorities will render this apparent.''

It is true, as pointed out by plaintiff in error, that the legislature in 1885 amended the provision of the Howell Code adopting the common law as follows: ''The common law of England so far only as it is consistent with and adapted to the natural and physical condition of this territory, and the necessities of the people thereof, and not repugnant to or inconsistent with the constitution of the United States, or Bill of Rights, or laws of this territory or established customs of the people of the territory is hereby adopted and shall be the rule of decision in all the courts in this territory.'' Laws 1885, p. 133, No. 68. It is further pointed out that, by the revision of 1887, the common-law doctrine of riparian rights was in terms abolished, in the following language: ''The common-law doctrine of riparian water rights shall not obtain or be of any force or effect in this territory.'' Rev. Stats. 1887, par. 3198. If the legislative intent had been, prior thereto, in doubt, these provisions of the statute, under the rule applicable to the construction of statutes, would have weight, and possibly controlling weight, on the side of the view that the common-law doctrine of riparian rights had theretofore been recognized. The conflict between the legislation of the territory prior to 1885 and the common law with respect to riparian rights appears to us to be so sharp and well defined that the legislature may not, notwithstanding the amendments referred to, be presumed to have recognized thereby the common law as theretofore applying in the territory.

Whether or not the applicability of the common law to the physical conditions which prevail in the territory should enter into the construction to be given the statute, and whether or not the subsequent legislation can be construed as a recogni-

tion that the common law as to riparian rights was adopted by the statutes of 1864 adopting the common law, we think a reading of the latter makes it clear that any right granted by the statute was not intended to become property in such a sense that it might not be abrogated by future legislation. The limitation expressed in the act cannot be construed as referring solely to the laws of the United States or of the territory in force at the time of the adoption of the statute. As we have said, prior to 1864 the common law was not in force within this territory or in New Mexico. *Trambley* v. *Luterman*, 6 N. M. 15, 27 Pac. 312. The supreme court of the United States, in the case of *United States* v. *Rio Grande Irr. Co.,* 174 U. S. 702, 19 Sup. Ct. 770, 43 L. Ed. 1136, said: "The unquestioned rule of the common law was that every riparian owner was entitled to the continual natural flow of the stream. . . . While this is undoubted, and the rule obtains in those states in the Union which have simply adopted the common law, it is also true that, as to every stream within its dominion, a state may change this common-law rule and permit the appropriation of the flowing waters for such purposes as it deems wise. Whether this power to change the common-law rule and permit any specific and separate appropriation of the waters of the stream belongs also to the legislature of a territory, we do not deem it necessary, for the purposes of this case, to inquire. We concede arguendo that it does."

If the legislature of the territory may confer riparian rights by statute, it seems to us clear that it may do so upon the condition that such rights thus conferred may subsequently be modified or abrogated. Where the legislature has, subject to future legislation, conferred riparian rights to the use of water from flowing streams upon riparian owners, the latter cannot be said to be vested in such a sense as that they may not be subsequently abrogated by statute, at any rate when the riparian owner has made no use of the water permitted him at common law. It is conceded that no use of the water of the San Pedro river was made by any predecessor in interest of plaintiff in error between 1864 and 1887. If, therefore, the statute of 1864 conferred riparian rights as recognized at common law upon the predecessors in interest of the plaintiff in error, and this grant was limited by the condition that they might be, by future legislation, abrogated, it follows

that in the case at bar such rights as may have been conferred by said statute were abrogated by the statute of 1887.

The contention of the plaintiff in error that, under the treaty of Guadalupe Hidalgo, the owner of a Mexican grant, title to which had vested at the date of the treaty, retained all vested rights of property to which he was entitled under the laws of Mexico, is undoubtedly sound. The legislature of Arizona has no power or authority to deprive any such owner of any such rights, at least without due compensation. The plaintiff in error is the owner of such a grant. It remains to be determined, therefore, what, under the laws of Mexico prior to 1854, were the rights of an owner of land within the Gadsden Purchase to the water of a stream flowing through his land. Counsel for plaintiff in error asserts in his brief that these rights were substantially those of a riparian owner at common law. In support of this assertion, he cites the celebrated case of *Lux* v. *Haggin, supra.* We have carefully considered this case in its bearing upon this question, and have reached the conclusion that the learned court, in reviewing the subject in the light of the authorities upon Spanish and Mexican law available to it, did not define with certainty the rights of a riparian owner of land in California prior to the cession. The court laid down as its general conclusion that: "By the law of Mexico, the running waters of California were not dedicated to the common use of all the inhabitants in such sense that they could not be deprived of the common use." This general declaration is construed by the court subsequently in its opinion as follows: "The waters of innavigable rivers, while they continued such, were subject to the common use of all who could legally gain access to them for the purposes necessary to the support of life. But the Mexican government possessed the power of retaining the waters in their natural channel, or of conceding the exclusive use of portions of them to individuals or corporations, upon such terms or conditions, and with such limitations, as it saw fit to establish by law."

Here, it seems to us, is a clear declaration, assuming it to correctly state the Mexican law, that the use to which the waters of an innavigable river or stream might be put was the subject of legislative control. If the legislature, therefore, could concede to individuals or corporations exclusive right to the use of the water of innavigable streams, we are unable to see how riparian rights, in the nature of those recog-

nized at common law, could possibly exist under the Spanish law, for, as we have seen, the essential feature of the common-law doctrine was its denial of the right of exclusive use by even the riparian owner. If, under the Mexican law, the use of waters of innavigable streams was under legislative control, the change of sovereignty operated merely to transfer this right of control from Mexico to the government of the United States. This being so, it must follow that the owner of the land grant, with the change of sovereignty, stood in exactly the same position as before, with relation to the right of the sovereignty to grant the exclusive use of waters of any innavigable stream, flowing through or adjoining the grant, to whomsoever it might choose. The United States, or its delegated authority, the territory of Arizona, might, therefore, confer common-law rights upon the riparian owner, or might establish the right of prior appropriation, and grant this right to others than riparian owners. As we have seen, the legislatures of New Mexico and of Arizona, under their delegated authority from the sovereignty of the United States, to whom, under the doctrine stated in *Lux* v. *Haggin,* passed the right of control over innavigable waters by the treaty of cession from Mexico, have chosen to deny to riparian owners exclusive rights and to confer upon others rights to the use of such water without reference to the situation of the lands owned by the latter with respect to the streams from which such water may be taken.

Whatever may have been the general law throughout the Republic of Mexico on the subject of water, it is reasonably certain that in the state of Sonora the doctrine of appropriation, as now recognized, was to some extent in force by custom. In this territory irrigation was practiced in the Santa Cruz valley prior to the cession, and it is well known the right of appropriation without regard to the riparian character of the lands was there in force probably from the time when the Spaniards first settled in the valley. Our statutes, as well as those of New Mexico, seem to have had their origin in the Mexican law, as modified by custom. To concede, therefore, to the owner of the grant in question riparian rights, would be in effect to concede to it what his predecessors in interest do not appear to have possessed prior to the cession under the Gadsden Purchase.

We think the court below did not err in applying the existing law of the territory in its decision of the questions at issue,

and that its judgment and decree should be affirmed, and it is so ordered.

KENT, C. J., and CAMPBELL, J., concur.

NAVE, J.—I concur with the reasoning and deductions in the opinion of Mr. Justice Sloan, but deem it appropriate, despite the conclusiveness of that reasoning, to state a broader ground upon which the same conclusion is inevitable. The essence of the common law is flexibility and adaptability. It is not a body of fixed rules, but is the best product of human reason applied to the premises of the ordinary and extraordinary conditions of life, as, from time to time, they are brought before tribunals. Hence, though the common law is homogeneous, yet it finds widely different expression in different jurisdictions. Should the common law become so crystallized that its expressions must take the same form, wherever the common-law system prevails, irrespective of physical, social, or other conditions peculiar to the locality, it would cease to be the common law of history, and would be but an inelastic and arbitrary code. The common law historically has carried with it, and as part of it, the principle that precedents —earlier deductions from known conditions—must yield to the reason of different or modified conditions. This is expressed, and analogously applied, in *People* v. *Appraisers*, 33 N. Y. 461, where it is said: "No doctrine is better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes, not only such laws as are inconsistent with the spirit of our institutions, but such as were framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a case where that reason utterly fails." In Arizona, neither prior to its acquisition from Mexico nor since, has the doctrine of riparian rights had practical application or recognition. Great property rights have become established upon a different theory. The physical conditions and the demands of agriculture and mining are utterly inconsistent with its applicability. It would be entirely destructive of an agricultural system, which, though now great and of immense value, is but on the threshold of its development. This precise point has been considered and adjudicated by the supreme

court of Nevada in *Reno etc. Works* v. *Stevenson,* 20 Nev. 269, 19 Am. St. Rep. 364, 21 Pac. 317, 4 L. R. A. 60. The principle I invoke has found varied and frequent application. Numerous illustrations are collected in 8 Cyc. 380. It was applied by the supreme court of the United States in *Jones* v. *Clifton,* 101 U. S. 225, 25 L. Ed. 908, quoted with approval in *Luhrs* v. *Hancock,* 181 U. S. 571, 21 Sup. Ct. 726, 45 L. Ed. 1005.

Without further elaboration of my reasons, I state my belief that the utter incompatibility of the doctrine of riparian rights with the conditions of life in this territory is an all-sufficient reason, under the principles of the common law itself, to hold that that doctrine is not here in force.