[No. 1675.]

EBENEZER TWADDLE AND EBENEZER TWADDLE
AS ADMINISTRATOR OF THE ESTATE OF ALEXANDER
TWADDLE, DECEASED, RESPONDENT, *v.* THEODORE
WINTERS, A. C. WINTERS, L. W. WINTERS, AND
SAMUEL LONGABAUGH, APPELLANTS.

1. APPEAL—TIME OF TAKING—DISMISSAL. Where a judgment was rendered on June 23, 1903, and no appeal was taken therefrom until March, 1905, the appeal will be dismissed for failure to prosecute the same within a year.

2. NEW TRIAL—MOTION—STATEMENT—PREPARATION—EXTENSION OF TIME. Where the court reporter who took the evidence in an action left the state before preparing a transcript thereof, the parties against whom the judgment was rendered were entitled to such extensions of time to prepare a statement as a basis for a motion for a new trial as was necessary to enable them to secure a transcript of the testimony from the reporter and prepare such statement.

3. JUDGES—JURISDICTION—POWERS IN CHAMBERS—EX PARTE ORDERS. Comp. Laws, 3292, authorizes the judge before whom a case was tried to extend the time for the preparation of a statement on a motion for a new trial, and District Court Rule 43 declares that only the judge having charge of the cause shall grant further time to do any act required to be done in the cause or proceeding, unless it is shown by affidavit that such judge is absent from the state or from some other cause is unable to act. Rule 41 provides that, when any judge shall have entered upon the hearing of a proceeding, no other judge shall do any act in the cause unless on the written consent of the judge first hearing the cause. Comp. Laws, 2573, declares that the district judges of the state shall have coextensive powers throughout the state, and may each exercise the functions of judges in chambers at any point in the state, subject to the provisions that each judge may direct and control the business in his own district. *Held,* that where, on the determination of a cause, the judge entered an order that all further business not completed and all new business brought before the court during the absence of such judge should be referred to the judge of another district, the judge of such other district had jurisdiction in chambers within his own district to grant an *ex parte* order extending the time for the preparation of a statement on a motion for a new trial in the cause tried by the absent judge, without an affidavit that the latter was still absent at the time the order was granted.

4. WATERS AND WATER COURSES—IRRIGATION—DIVERSION OF WATER—EVIDENCE. In an action to determine water rights alleged to have been appropriated by plaintiff's grantors, evidence *held* to sustain a finding awarding to plaintiffs one hundred and eighty-four inches under a four-inch pressure.

5. SAME—INJUNCTION—DECREE. Where, in an action to determine water rights, defendant was enjoined from withdrawing from plaintiff's ditch water to which plaintiff was entitled, but there was evidence that there were times during the summer when it was not necessary to use

as much water as plaintiff's ditch carried, on which occasions it should be turned to defendants, the injunction should specifically award such water to defendants, notwithstanding that their right thereto might be implied by law.

6. SAME—TIME—IRRIGATION SEASON.  Where plaintiff's intestate had testified, in a suit to determine water rights, that the irrigation season closed about October 1st of each year, and that sometimes he used water from the ditch in question a little later, a perpetual injunction restraining defendants from interfering with plaintiff's rights should limit plaintiff's right to use the water for irrigation to October 15th of each year.

7. SAME—DEEDS—CONSTRUCTION.  Where a deed from plaintiff's predecessor in interest in certain land, to which defendants succeeded, conveyed one-third of a certain water ditch and flume, described, with the privilege of running water through the flume and ditch to the land conveyed, such provision did not constitute a grant of water, but merely the right to convey water otherwise acquired through the flume and ditch.

8. WATERS AND WATER COURSES—RIPARIAN PROPRIETORS—PRIOR APPROPRIATION.  The fact that patents for defendants' lands lying along the banks of a creek were issued to defendants before adoption of Act Cong. July 26, 1866 (14 Stat. 251, c. 262), providing for the appropriation of water for irrigation purposes, did not confer on the owners of such land riparian common-law rights to the waters of the creek as against prior appropriators.

## ON REHEARING.

1. APPEAL — DEATH OF PARTY — SUBSTITUTION — STATUTORY PROVISIONS.  Supreme Court Rule 9 provides that upon the death or disability of a party pending an appeal, his representative shall be substituted. Comp. Laws, 3111, provides that an action shall not abate by the death or other disability of a party or the transfer of any interest therein, if the cause of action survive or continue, but may be continued by or against his representative or successor in interest; and, in case of any other transfer of interest, the action may continue in the name of the original party or in the name of the person to whom the transfer is made.  *Held*, that the rule is not in conflict with the statute, the two agreeing in allowing the substitution of the representative of a deceased litigant, but the statute going further, and directing that the action may be continued by or against his successor in interest or the person to whom he has transferred his interest.

2. COURTS—RULES.  Where there is a conflict between a statute and a supreme court rule, the former will control.

3. SUBSTITUTION—PARTIES ENTITLED.  Where a deceased litigant had conveyed his interest in an action in which there was no counter claim the grantee or successor in interest should be substituted as a party to the action, rather than the representative of decedent.

4. APPEAL—DEATH OF PARTY.  Where a case was fully determined in the district court and on the appeal before the death of one of the litigants, who conveyed his interest to several parties who hold as tenants in common, it is not necessary to substitute as parties to the action all the tenants in common.

5. REHEARING. Litigants are not entitled to rehearing as a matter of right.

6. DEATH OF PARTY—SUBSTITUTION. Under Comp. Laws, 3111, which provides that an action shall not abate by the death of a party when the cause of action survives and the case may, upon the death of a party, be continued against his representative or successor in interest, the death of a party pending an appeal does not oust the jurisdiction of the supreme court, and the failure to substitute his representative does not render its judgment void.

APPEAL from the District Court of the Second Judicial District, Washoe County; *B. F. Curler*, Judge.

Action by Ebenezer Twaddle and others against Theodore Winters and others. From a decree in favor of plaintiffs, defendants appeal. Motion to dismiss appeal from judgment granted. Motion to dismiss appeal from order denying a new trial denied. **Judgment modified. Rehearing denied.**

The facts are sufficiently stated in the opinion.

*Alfred Chartz*, for Appellant:

I. No injunction will lie where there is a complete and adequate remedy at law, and will issue only to prevent apprehended injury, and affords no remedy for wrongs already committed. (*Champion* v. *Sessions*, 1 Nev. 478; *Conley* v. *Chedic*, 6 Nev. 222; *Sherman* v. *Clark*, 4 Nev. 138; Am. & Eng. Ency. Law, vol. 16, p. 360.) It is submitted that an appropriation of water by means of a ditch is not measured by the capacity of the ditch, but is limited to such quantity, not exceeding its capacity, as the appropriator may put to beneficial use, and no matter how great in extent the original quantity may have been, nor no matter how much land said appropriator may intend to irrigate, any amount less than the whole amount which has not been devoted to a beneficial use at some time within five years is lost and forfeited as against a subsequent appropriator. (*Smith* v. *Hawkins*, 120 Cal. 86; *Senior* v. *Anderson*, 115 Cal. 496.) In the case at bar, Hawkins dug a ditch in 1857, and there is no testimony showing what quantity of water it carried, if any at all. In 1860 George Douglass saw a flume,

and, he thinks, it was a twelve-inch flume. The court finds said flume carried one hundred and eighty-four inches of water. In 1863 Sturtevant was irrigating only about twenty or twenty-five acres of land. Alex. Twaddle testified that when he saw the land in 1869 it was then being cultivated as now. In 1859 the Mike Gwinner ditch was constructed, and in 1864 the flume ditch, which is large enough to take the entire creek, was constructed. Under the foregoing authorities, plaintiffs having failed to put to beneficial use any more water than would irrigate twenty or twenty-five acres of land, it would make no difference how much was turned into the Hawkins ditch of 1857 or the Sturtevant flume of 1860; they would be limited in their prior rights to only sufficient water to irrigate twenty or twenty-five acres of land, Winters having initiated intervening rights that would be superior to any right plaintiffs might have to irrrigate lands that they brought under cultivation five years after their first diversion of water. It was absolutely necessary for plaintiffs to prove how much water the Hawkins and all other ditches carried, and, under the foregoing rule cited in the California Reports, it was equally necessary to prove how much land plaintiffs irrigated prior to the initiation of any rights by Winters.

II. A prior appropriator, who fails to use a part for some beneficial purpose, is only entitled to that part actually and necessarily applied to a beneficial use. (*Becker* v. *Marble Creek Irr. Co.*, 15 Utah, 225, 49 Pac. 892, 893; *Lobdell* v. *Simpson*, 2 Nev. 274; *Water Co.* v. *Powell*, 34 Cal. 109; Gould on Waters, sec. 231; Kinney on Irr. secs. 175-6; *Proctor* v. *Jennings*, 6 Nev. 83.) The question before the court is: In 1859, when the Mike Gwinner ditch was constructed, how much water had the plaintiffs appropriated, and how much land had they in cultivation, and what amount was inclosed? They had about fifteen acres of land inclosed, and there is no proof that they had conducted any quantity of water upon it. The amount of water to which the first appropriator is entitled must be limited to the

amount actually applied to the purposes of irrigation. (*Simpson* v. *Williams*, 18 Nev. 432; *Union M. & M. Co.* v. *Dangberg*, 81 Fed. 94.)

III. "The act of Congress of July 26, 1866, is prospective in its operation, and does not in any manner qualify or limit the effect of a patent issued before its passage." (*Union M. & M. Co.* v. *Ferris*, 2 Saw. 176.) It is well known that the statute of limitations does not run against the United States. Defendant Winters owns patent prior to the act of Congress of July 26, 1866. The law of appropriation only applies to streams in which no riparian rights have attached. (*Baxter* v. *Gilbert*, 124 Cal. 580; *Hill* v. *Smith*, 27 Cal. 476; Long on Irrigation, secs. 25, 26.)

IV. There is no claim on the part of plaintiffs or decree of court showing or tending to show that any other ditch or flume, other than the upper Twaddle ditch or flume, had any prior right to the use of the waters of Ophir Creek, but the court did decree that plaintiff could use one hundred and eighty-four inches of the waters of Ophir Creek upon his lands, either through the lower or upper Twaddle ditches. The evidence conclusively shows that the lower Twaddle ditch, so called, never reached further than the north side line of the Bowers field, even as late as 1871. The evidence shows that this ditch has been extended across the Bowers Mansion field since 1871, and into and upon the Twaddle thirty-two acres of grain land, which said grain land cannot be irrigated by means of the upper Twaddle ditch, and that the right to irrigate the thirty-two acres of grain land, described in the pleadings and testimony, by means of said ditch would begin in 1871, and would be subsequent in time to all the rights initiated by defendants prior to said date.

*Cheney & Massey*, for Respondents:

I. Our conclusion is that, no matter what view be taken of the case, the confessed admission of the appellants is to the effect that no water was ever taken from Ophir Creek for the irrigation of any lands then owned or now owned by Theodore Winters earlier than 1859, and that almost none of

the waters taken by Winters from Ophir Creek or used upon the lands now owned by Winters was taken out until long after the lands described in the complaint in this action had passed into the possession of John Twaddle in 1869.

II.   Without entering into a discussion of the law at all, it is sufficient to say that since the decision of *Jones* v. *Adams*, the supreme court of this state has repeatedly declared that, because of the arid conditions existing here, because of the necessities of the people, and because all progress, growth, and development in this state would be retarded by this application of the doctrine of riparian rights, it never has and does not now exist in this state.   Counsel for appellants has cited a number of authorities from the State of California respecting the rights of riparian owners, and it is only necessary to call the court's attention to the fact that in California a mongrel doctrine has developed which has unsettled the rights of users of water in that state, both as to the common-law right of riparian ownership and the doctrine of appropriation as it exists here.   These cases can have no application at all to the facts in this case.

III.   Counsel further contends that, because Hawkins in 1857 did not have the one hundred and sixty acres in his possession all irrigated by the waters of Ophir Creek, his appropriation is limited to the number of acres actually irrigated in that year.   This, court and counsel well know, is not the rule of law prevailing in this state or in any other state as to the appropriation of waters for beneficial use. Where a person in good faith commences to take out a ditch, with a capacity sufficient to irrigate a certain tract of land, and prosecutes that enterprise with reasonable diligence, the courts have universally held as a matter of law that his appropriation related back, and was initiated to an amount of water sufficient to irrigate that tract of land, to the date when he commenced the construction of the ditch or actually diverted the water.   In the case at bar it appears that the ditch was commenced in 1856, completed in 1857, and late in the season of 1857 the water was actually turned through the ditch to and upon the lands in possession of Hawkins, and crops were produced in that year by the use of its waters.

*Cheney & Massey*, for Respondents, to dismiss appeal from judgment and from order denying a new trial:

I.   An inspection of the records in this case will show that the judgment of the District Court of the Second Judicial District, State of Nevada, was rendered on the 23d day of June, 1903, and that the notice of appeal was filed with the clerk of said district court on the 17th day of March, 1905, and served upon the respondents' attorneys on the same day, nearly nine months after the expiration of the year within which the notice of appeal was required by law to be filed and served.

II.   The last sentence of section 197 of the practice act provides: "The several periods of time limited may be enlarged by the written agreement of the parties, or upon good cause shown, by the court or the judge before whom the cause was tried." This sentence limits the power to enlarge the period of time limited in the section to the court or the judge trying the case. The question of whether or not Judge Murphy might have made the order when sitting as the Court of the Second Judicial District at Reno, is immaterial. At the time the order was made he was not the court, for a recess of the court had been ordered; neither was he the judge before whom the case had been tried. It is a general rule "that such business as may be transacted out of court is exceptional, and must find express authority in statute." (4 Ency. Pl. & Pr. 337; *Larco* v. *Casaneuava*, 30 Cal. 561; *Loomis* v. *Andrews*, 49 Cal. 239; *Ellis* v. *Karl*, 7 Neb. 381.) "Jurisdiction at chambers is incidental to and grows out of the jurisdiction of the court itself; hence it follows that the jurisdiction of a judge at chambers cannot go beyond the jurisdiction of the court to which he belongs, or extend to matters with which his court has nothing to do." (4 Ency. Pl. & Pr. 338; 17 Am. & Eng. Ency. Law, 723.)

III.   In *Golden Fleece Co.* v. *Cable Co.*, 15 Nev. 450, this court held to a strict construction of the statute, and decided that a statement filed in time, but served the day following, and one day after the time to file and serve had expired, was served too late and should be stricken from the records. This court further held in consonance with its former deci-

sions, strictly construing section 197 of the practice act, that a statement having been prepared exclusively as a statement on motion for a new trial could not be considered as a statement on appeal from the judgment. (*Robinson* v. *Benson*, 19 Nev. 331; *Williams* v. *Rice*, 13 Nev. 234; *Nesbitt* v. *Chisholm*, 16 Nev. 39.) These cases, above cited, show the tendency of this court to strictly construe section 197 of the practice act, and we submit that the same rule of decision should apply to the rule in question. Where the rule requires a certain act to be done as a prerequisite to the granting of additional time to file the statement, the court should not nullify its operation to the extent of permitting a presumption in the mind of the judge to be substituted in place of the positive averment which the rule requires. It has been held by this court that when the time within which the statement is required to be filed has expired, the failure to file the statement operates as a waiver of the right, and the district court has no power to reinstate the right. (*Elder* v. *Frevert*, 18 Nev. 278, 282; *Hoppin* v. *Cheney*, 24 Nev. 222.)

*Alfred Chartz*, for Appellants, in reply:

I. The writ of *certiorari* will ordinarily be granted, where a party has been deprived of his appeal by the improper conduct and unauthorized act of the court or judge, as where a party had been deprived of his appeal, without his fault, by the erroneous action of the judge in refuting the same; or where, without laches on the part of the petitioner, he has been deprived of his appeal by the procurement of the adverse party, or by the inattention, neglect or fault of an officer of the law. (4 Am. & Eng. Ency. Pl. and Pr. 63, and authorities cited.)

II. On the main question of water rights, appellants desire to call the attention of the court further to the following authorities: Black's Pomeroy on Water Rights, secs. 33, 42, 44. Said authorities support the contention of appellants that, being the first owners of land through which Ophir Creek ran, no appropriation of the waters of Ophir Creek could legally be made as against said riparian ownership, and that no right by virtue of appropriation

could be superior to any riparian right until after 1866. Anything appearing in *Jones* v. *Adams* contrary to the foregoing is purely *obiter dicta*, and not binding on this court in the case at bar.

By the Court, TALBOT, J.:

The respondents have moved to dismiss the appeal from the judgment because it was not taken within one year, and to dismiss the appeal from the order of the district court denying appellants' motion for new trial, and also to strike from the records the statement on motion for a new trial, upon the ground that the statement was not filed within the time prescribed by law. The appeal from the judgment is dismissed, because not taken until March, 1905, more than one year after its rendition on June 23, 1903. On that day Judge Curler, of the Second Judicial District Court, who had tried the case at Reno and rendered the decree, made in open court and had entered in the minutes an order "that all business and all cases and proceedings that have not been completed or in the process of completion, and all new business that may be brought before the court during the absence of the presiding judge, be referred to Judge M. A. Murphy, of the First Judicial District Court of the State of Nevada, and that he be requested to try, determine, and dispose of all cases and business now before the court in the absence of the judge of this district." Pursuant to this request Judge Murphy occupied the bench in Reno until July 31, 1903, when a recess was taken until the further order of the court. There was no other session until Judge Curler's return on August 17th.

On July 17th Judge Murphy, in open court in Reno, made an order allowing plaintiffs until August 15th in which to file objections to findings, and to prepare additional findings. On August 3d Judge Murphy at Carson City, and within his own First Judicial District, by an *ex parte* order made without affidavit of Judge Curler's absence or inability, granted the defendants until September 15, 1903, within which to prepare, file, and serve their notice and statement on motion for new trial. Later extensions were made by Judge Curler, but whether they are effectual

depends upon this order, which respondents claim Judge Murphy was unauthorized to make under section 197 of the practice act (Comp. Laws, 3292), which provides in regard to notices and statements on motions for new trial that "the several periods of time limited may be enlarged by the written agreement of the parties, or upon good cause shown by the court, or the judge before whom the case was tried," and under District Court Rule 43, which directs that "no judge, except the judge having charge of the cause or proceeding, shall grant further time to plead, move, or do any act or thing required to be done in any cause or proceeding, unless it be shown by affidavit that such judge is absent from the state, or from some other cause is unable to act."

Rule 41 provides: "When any district judge shall have entered upon the trial or hearing of any cause or proceeding, demurrer or motion, or made any ruling, order or decision therein, no other judge shall do any act or thing in or about said cause, proceeding, demurrer, or motion, unless upon the written request of the judge who shall have first entered upon the trial or hearing of said cause, proceeding, demurrer or motion." Section 2573 of the Compiled Laws, passed after section 197 of the practice act as quoted, enacts: "The district judges of the State of Nevada shall possess equal coextensive and concurrent jurisdiction and power. They shall each have power to hold court in any county of this state. They shall each exercise and perform the powers, duties and functions of the court, and of judges thereof, and of judges at chambers. Each judge shall have power to transact business which may be done in chambers at any point within the state. All of this section is subject to the provisions that each judge may direct and control the business in his own district, and shall see that it is properly performed."

We think under the minute order and circumstances related, the power inherent in Judge Curler to extend the time for filing the notice and statement became conferred upon Judge Murphy during the former's absence, and that Judge Murphy became the judge in charge, endowed with authority to grant the extension without the presentation of an affidavit show-

ing the absence or inability of Judge Curler, as the rule
requires before the order can be made by a judge not having
the business in charge. Judge Curler's absence was pre-
sumed to continue until his return was shown, and con-
sequently Judge Murphy's authority, based upon that absence,
would likewise continue. It is said that under the first
statute mentioned the language that "the court or judge
before whom the case was tried" may extend the time invali-
dates the order, because Judge Murphy was not the judge
before whom it was tried, and that he was not the court after
he returned to Carson City, where he made the order. In a
narrow, technical sense this may be true, if we do not look
beyond the strict letter of the statute. But not so if we
consider the intent and purpose of the enactment, and con-
strue it in the light of reason as applied to the ordinary rules
of practice, and give due weight to the later section. Appar-
ently the object of this legislation was to prevent the grant-
ing of extensions and the meddling of judges in cases which
they had not tried or which were not properly under their
control, and yet, in case of the absence or inability of the
judge who tried the action, to grant relief or allow extensions
to be made to deserving litigants.

The argument advanced concedes that, if Judge Murphy
had gone to Reno and entered the order in open court, it
would have been good; but, under this contention, if he had
stepped through the door into the chambers and made it, it
would have been void. Orders extending the time for filings
are business usually or properly transacted in chambers, and
under section 2573 can and ought to be made as effectually
in any part of the state, by the judge having the case in
charge, as if made by him in chambers or in open court.
Judge Murphy was merely acting for Judge Curler during his
vacation, but by analogy the construction claimed, if adopted,
would, in every case where a district judge dies, resigns, or is
succeeded, invalidate the orders extending time under section
197 made out of court by his successor in office, although
they are of that character ordinarily granted in chambers.
This would mean a distinction and two rules for filing orders
of the same kind, and that the judge who had tried the

cause, as Judge Curler had done in this instance, could make the order in chambers, while his successor could so make it only in the cases tried by him, and would have to be in court to make these simple orders extending time in actions which had been previously tried by another judge.

Appellants desired and were entitled to the time granted for the purpose of enabling them to secure from the court reporter, who had left the state, a transcript of the testimony given on the trial, which would enable them to properly prepare the statement. Under section 2573 Judge Curler could have made an order granting them the extension at any place in the state, and, as during his absence Judge Murphy was requested by the court minute to attend to all business for him, we conclude that he was empowered to make the order at Carson City as he did, and as Judge Curler could have done, and that it was not necessary for him to make the trip to Reno and undergo the formality of opening court to enter *ex parte* orders simply extending time, such as are usually made out of court.

The motion to dismiss the appeal from the order overruling the motion for a new trial and to strike out the statement is denied.

ON THE MERITS. ·

This action was brought by Alexander Twaddle, in his lifetime, and by Ebenezer Twaddle, as coöwners, for four hundred and fifty miners' inches running under a six-inch pressure of the waters of Ophir Creek, alleged to have been appropriated by their grantors in the year 1856 "by means of dams, ditches, and a flume" for the irrigation of their ranch, containing two hundred and three and ninety-two one-hundredths acres in Washoe County. The answer denies the allegations of the complaint, sets up the ownership by the defendants Winters of a tract of land about one mile wide by two miles long, and alleges appropriations by them or their grantors, aggregating six hundred inches flowing under a four-inch pressure, by the year 1867, which are stated to be prior to any diversion of the water by the plaintiffs, and asserts a claim for defendant Longabaugh to one hundred and eighty inches for fluming wood, lumber, and

ice from large tracts of timber lands owned by him, and for domestic use and irrigating garden on forty acres at Ophir. Witnesses appeared to sustain and others to dispute plaintiffs' right as initiated a half century ago, and the same is true regarding the claims of these defendants.

The record affords a glimpse of pioneer history at a period previous to the admission of this state into the Union, and portrays the building and decay of saw and quartz mills and the rise and decline of towns by the banks of the stream, the waters of which are here in litigation. One witness testified that the Hawkins ditch, now known as the "upper Twaddle ditch," was completed in 1857, and that he turned the water into it that year. Others stated that the water was running in the ditch and flume about that time, and that these were apparently in the same place and of about the same capacity as at present. On behalf of defendants other witnesses testified that they were over the ground and saw no ditch, and that none existed there during those earlier years. It is unnecessary for us to detail the conflicting portions of the evidence. These were carefully considered by the district court, and for the reasons stated in its decision, enforced by statements in deeds made many years before any controversy arose, the finding that this ditch was constructed and a prior appropriation of water made through it in 1857 finds ample support. At first on the Twaddle ranch land was plowed for only a garden and a small piece of grain, and but little hay was cut. A reasonable time was allowed in which to extend and complete the use of the water that would flow through the ditch, and the quantity of land irrigated was increased.

The lower Twaddle ditch was constructed from Ophir Creek at some time prior to 1869, and runs to and irrigates the eastern portion of plaintiffs' ranch. It is shown that since that year, at least, their lands have been in practically the same state of cultivation and irrigation that they were in at the time of the commencement of this action, and that during that period plaintiffs used all the water they needed from Ophir Creek without interruption, except in 1887, 1898, and at the time this suit was begun. It appears that the plaintiffs had not materially increased their appropriation in

thirty-three years, while Theodore Winters admitted upon the stand that during the last ten or fifteen years he had been using twice as much water from Ophir Creek, in addition to that from other streams, as he used during the first ten years that he cultivated his lands. As he claims and uses more than the plaintiffs, we conclude that this large increase in his diversion of the waters of the stream since the completion of their appropriation which has remained stationary may account for the shortage and dispute.

By consent of the parties in open court the district judge, accompanied by a civil engineer who had testified as a witness for the defendants, viewed the premises and made measurements. At the point of least carrying capacity of the upper Twaddle ditch, which is the old square flume near the Bowers Mansion and grave, he measured the flow at one hundred and eighty-four inches and the water lacked more than two inches of reaching the top. A surveyor had testified for the plaintiffs that its capacity was one hundred and eighty-two inches at this point, and that the capacity of one hundred feet of the old flume remaining up nearer the head of the ditch which had been impaired by age and abandoned, and supplanted by a new V flume built above the old one by the plaintiffs in 1900, was one hundred and fifty inches. At this point the judge found that the one hundred and eighty-four inches of water which he had measured below about filled the new V flume, and he estimated that this old flume would carry from two hundred to three hundred inches. From his examination of the premises and the character of the soil, the court was of the opinion that the plaintiffs required, and were entitled to, at least the amount of water they had flowing in the flume at the time he made the examination, and he decreed them a prior right to one hundred and eighty-four miners' inches running under a four-inch pressure, or three and thirty-four fiftieths cubic feet per second, from April 15th to November 15th of each year, and twenty inches, or two-fifths of one cubic foot per second, for domestic use and watering stock at other times. It is claimed that the amount allowed is not warranted by the evidence, because more than the capacity of the upper Twaddle ditch,

as shown by the testimony mentioned, fixing it at one hundred and eighty-two inches at the point above the mansion, and at one hundred and fifty inches along the one hundred feet of old flume, through which the water flowed prior to 1900. It is not necessary to determine whether the court, on its own examination and measurement, may allow a quantity beyond the range of the evidence, nor whether the surveyor could accurately estimate the capacity of the one hundred feet of old flume without knowing the volume and velocity of the water that entered it, nor whether the variation of one part in ninety-one or the difference between one hundred and eighty-two inches in his measurement and that of one hundred and eighty-four by the judge should be disregarded as too trifling to be material and as a slight discrepancy to be expected; for the judgment for the thirty-four inches which defendants claim should be deducted, because in excess of the capacity of the upper ditch and flume before the construction of the V flume in 1900, is supported by the finding of the court that the plaintiffs and their grantors had for more than thirty-one years before the commencement of this suit used a portion of the water through the lower Twaddle ditch. It is urged that one hundred and eighty-four inches is more than required for the irrigation of plaintiff's ranch, and that this is especially so because a few of their one hundred and seventy and forty-five one-hundredths acres of cultivated land lie above the line of their upper ditch from Ophir Creek, and a small portion is naturally swampy. The quantity of water allowed by the decree seems very liberal, both for irrigation and for domestic use and watering stock. Engineers and others testified that one-half and three-fifths of an inch of water per acre was sufficient, while for the plaintiffs, farmers from the vicinity varied in their estimates of the amount necessary from one and one-half inches to three and one-half inches per acre. The evidence indicated that the plaintiffs had used as much water as that awarded to them, or more, and had uniformly produced good crops. Much of their land is sandy, with a considerable slope. After examining the soil and viewing the quantity of water as it ran on the premises, the court agreed

with the testimony of the plaintiffs that that amount was necessary, and adopted a mean between the highest and lowest estimates. The quantity of water requisite varies greatly with the soil, seasons, crops, and conditions, and we cannot say that the allowance is excessive.

Alexander Twaddle testified that there were times during the summer, evidently short periods after the land had been irrigated, when it was not necessary to use as much as the upper ditch full of water. On such occasions, and whenever it is not needed by the plaintiffs, it should be turned to the defendants, if they have any beneficial use for it, and not permitted to waste. It may be implied by the law, but it is better to have decrees specify, and especially so in this case, in view of the testimony stated and of the perpetual injunction, that the award of water is limited to a beneficial use at such times as it is needed. (*Gotelli* v. *Cardelli*, 26 Nev. 382.) The point and purpose of diversion may be changed if such change does not interfere with prior rights. Under the testimony of Alexander Twaddle that the irrigating season closes about the 1st of October, and that sometimes he used water a little later, we think preferably the decree should limit plaintiffs' right for irrigating purposes to October 15th. This may allow defendant Longabaugh to flume wood a month earlier at this season when the water is low, and allow Winters more for watering stock without material injury to the plaintiffs. Although his flume was erected many years ago, Longabaugh did not show any prior appropriation, and the decree properly enjoins him from interfering with that part of the water of Ophir Creek awarded to the plaintiffs, because he ran their water in his flume past their ditch and into the one owned by Winters, and joined with the other defendants in answering and resisting the rights of the plaintiffs. The decree does not prevent him from taking any water in the creek in excess of the amount awarded to plaintiffs. Nor does it in any way interfere with the water belonging to him coming from other sources. This he may turn into Ophir Creek and take out lower down, provided he does not diminish the flow to which the plaintiffs are entitled.

On May 30, 1877, John Twaddle, the father and predecessor in interest of the plaintiffs, conveyed to M. C. Lake "one-third of that certain water ditch and flume known as the 'Twaddle ditch,' leading from what is known as 'Ophir Creek' to the land of said Twaddle, southerly from said creek through the lands of C. F. Wooten and M. C. Lake, with the privilege of running water through said flume and ditch to what is known as the 'Bowers Mansion' or grounds; the expense of maintaining said ditch and flume to be paid by each in proportion to their interests in same." It will be noted that this language does not purport to grant any water, but rather the right to convey water, and that it amounts to a sale of a third interest in the ditch, with at least the privilege to that extent of running in it water which Lake had or might appropriate. Later the defendant Theodore Winters acquired the Bowers Mansion and grounds through conveyances which did not mention any interest in this ditch. It does not appear that Lake or his grantors ever made any use of the ditch, or ever contributed towards its repair. Alexander Twaddle stated on the stand that he did not claim all this ditch, and that the plaintiffs owned two-thirds of it. Whether under this deed the one-third interest in the ditch became appurtenant to the Bowers land when it was never used for its irrigation, and later passed with the land without being mentioned, and whether, after the lapse of twenty-five years without any use or contribution towards its repair, the grantee of Lake has a third interest as a coöwner in the ditch and that part of the flume which has not been superseded by the new one built by plaintiffs, are questions which we need not determine, for they, and that part of the judgment of the court which gives the plaintiffs the "exclusive use of the upper Twaddle ditch and flume," are not within the allegations of the pleadings, which contain no reference to the exclusive use of, or a third or any interest in, the ditch.

Under the assertion in the complaint of the appropriation of water "by means of certain dams, ditches, and a flume" the court properly decreed to plaintiffs the right to use the water through either or both the ditches running to their lands. They would have that right in the upper ditch if

their interest in it is only an undivided two-thirds, as the
court has given them jointly with the defendants in the
lower ditch; but whether the grantee of Lake owns and can
assert a right to an undivided one-third interest is a question
as foreign as the ownership of the mansion, and one which
ought not to be determined by the judgment, in the absence
of any issue or allegation concerning it. The defendants
specifically excepted to finding No. 12 in this regard.

Patents for defendants' lands lying along the banks of
Ophir Creek were issued to their grantors before the passage
of the act of Congress of July 26, 1866, and it is asserted that
for this reason a vested common-law riparian right to the flow
of the waters of Ophir Creek accrued, of which they could not
be deprived by that act. If this were true, defendants might
well be considered under the circumstances shown, to have lost
that right by acquiescence in the continued diversion of the
water by plaintiffs for a period many times larger than that
provided by the statute of limitations; but in this contention
counsel is in error. We do not wish to consider seriously or at
length an argument by which it is sought to have us overrule
well-reasoned decisions of long standing in this and other
arid states, and in the Supreme Court of the United States,
such as *Jones* v. *Adams*, 19 Nev. 78, 6 Pac. 442, 3 Am. St.
Rep. 788, *Reno Smelting Works* v. *Stevenson*, 20 Nev. 269, 21
Pac. 317, 4 L. R. A. 60, 19 Am. St. Rep. 364, and *Broder* v.
*Water Co.*, 101 U. S. 274, 25 L. Ed. 790, declaring that this
statute was rather the voluntary recognition of a preëxisting
right to water, constituting a valid claim to its continued
use, than the establishment of a new one.

As time passes it becomes more and more apparent that
the law of ownership of water by prior appropriation for a
beneficial purpose is essential under our climatic conditions
to the general welfare, and that the common law regarding
the flow of streams, which may be unobjectionable in such
localities as the British Isles and the coast of Oregon,
Washington, and northern California, where rains are fre-
quent and fogs and winds laden with mist from the ocean
prevail and moisten the soil, is unsuitable under our sunny
skies, where the lands are so arid that irrigation is required

for the production of the crops necessary for the support and
prosperity of the people. Irrigation is the life of our impor-
tant and increasing agricultural interests, which would be
strangled by the enforcement of the riparian principle.

Congress, in appropriating millions for storage and dis-
tribution, and our legislature have recognized the advantages
of conserving the water above for use in irrigation, instead
of having it flow by the lands of riparian owners to finally
waste by sinking and evaporation in the desert. The Cali-
fornia decisions cited for appellants may no longer be con-
sidered good law even in the state in which they were
rendered. In the recent case of *Kansas* v. *Colorado*, before
the Supreme Court of the United States, Congressman Need-
ham testified that irrigation had doubled and trebled the
value of property in Fresno and Kings Counties, California;
that they had to depart from the doctrine of riparian rights
and under that doctrine it would be difficult to make any
future development; that there has been a departure from
the principles laid down in *Lux* v. *Haggin* (Cal.), 10 Pac. 674,
because at that time the value of water was not realized; that
the decision has been practically reversed by the same court
on subsequent occasions; and that the doctrine of prior
appropriation and the application of water to a beneficial
use is in effect in force now in that state. We must decline
to award the defendants the waters of the stream as riparian
proprietors and patentees of the land along its banks prior
to 1866.

The case will be remanded for a new trial, unless there is
filed on part of the plaintiffs, within thirty days from the
filing hereof, a written consent that the judgment be modified
by limiting the use of the one hundred and eighty-four
inches or three and thirty-four fiftieths cubic feet per second
of water, awarded to the plaintiffs, to such times as may be
necessary for the irrigation of their crops or lands or for
other beneficial purposes, between April 15th and October
15th of each year, and by allowing plaintiffs for the remainder
of the time the twenty inches awarded to them, when neces-
sary for their household, domestic, and stock purposes, and
by striking from the decree the words: "It is further

ordered, adjudged, and decreed that said plaintiffs have the exclusive right to use and the exclusive use of said upper Twaddle ditch and flume at all seasons of the year." If such consent is so filed, the district court will modify the judgment accordingly, and, as so modified, the judgment and decree will stand affirmed.

## ON REHEARING.

[NOTE—The decision on rehearing of this case, which here follows, was rendered on March 30, 1907, at which time TALBOT, J., by operation of law, had become Chief Justice.]

By the Court, TALBOT, C. J.:

After the rendition of the decision in this case, and within the time thereby allowed, respondents filed their written consent to the modification of the judgment as suggested by. this court. Later one of the appellants, Theodore Winters, died, and upon the rehearing the attorney for the appellants moved to have Mrs. Nettie M. Gregory, Lewis W. Winters, Archie C. Winters, Mrs. Theodora Longabaugh, and Nevada Winters substituted as defendants and appellants in place of the deceased, upon the suggestion of his death and upon a deed from him to the parties named. The death and execution of the deed are not denied, but it is said that there may be an heir of the deceased other than the persons named, who may have some interest in the property, and objection is made that, under rule 9 of this court, only the representative of the deceased, and not his successors in interest, may be substituted. The opposing parties desired to argue the case on the rehearing, and proceeded accordingly.

The direction in this rule that, "upon the death or disability of a party pending an appeal, his representative shall be substituted in the suit by suggestion in writing to the court on the part of such representative, or any party on the record," does not necessarily conflict with the statute (section 3111, Comp. Laws), which provides: "An action shall not abate by the death, or other disability, of a party, or by the transfer of any interest therein, if the cause of action survive or continue. In case of the death or disability of a party, the court, on motion, may allow the action to be continued by or against his representative or successor in interest.

In case of any other transfer of interest, the action may be continued in the name of the original party, or the court may allow the person to whom the transfer is made to be substituted in the action." The two may be construed together. They agree in allowing the substitution of the representative of a deceased litigant. The statute goes' further than the rule, when it directs that, in case of the death of a party, the court, on motion, may allow the action to be continued by or against his successor in interest, and that, in the case of any other transfer, the court may allow the person to whom the transfer is made to be substituted.

If there were any conflict between the statute and the rule, the former would control. It would seem that ordinarily, where litigants convey their interest in actions where there is no counter claim, the grantee or successor may properly be substituted, whether the original litigant be living or not, and, if he be dead, that it would be proper to substitute the grantee rather than the representative of the deceased, who is without interest in the action. It is an old principle that one or more tenants in common may maintain an action on behalf of all, and on this theory it would seem that this case could proceed without substituting all the owners. The change of parties is not so important, as the case was fully determined in the district court and on the appeal before the death of Theodore Winters, and we have concluded not to vary our judgment as previously rendered. This leaves the rights of the parties as adjudicated before his death. It has often been held that litigants are not entitled to a rehearing as a matter of right. In *Phelan* v. *Tyler*, 64 Cal. 82, 28 Pac. 115, it was said: "There is nothing in the code which would justify the inference that the death of a party pending an appeal ousts the jurisdiction of the supreme court and renders its judgment void, unless before the rendition thereof a representative of said deceased party be substituted in his stead."

Regarding other points argued on the rehearing, we see no good reason for changing our decision, which directs the lower court to modify the judgment, subject to the consent of the respondents, which has already been given, and we

shall consider here only one of the contentions further urged by appellants on the rehearing. It is still claimed with considerable assurance that the testimony of the engineer that the capacity of the remaining piece of old, abandoned square flume below the more recently built V flume on the upper Twaddle ditch is only one hundred and fifty inches, is uncontradicted, and necessarily limits the prior appropriation to that amount, or thirty-four inches less than the judgment awards. No convincing argument is presented to show that plaintiffs are not entitled to this excess by reason of their use of at least that much through their lower ditch adversely for more than thirty years, and for periods far beyond the statute of limitation, without interruption; but, if it were conceded that the plaintiffs are entitled to no water by reason of their appropriation or use through their lower ditch, there is other evidence to support the judgment for one hundred and eighty-four inches. True, the record does not show that any witness stated that he measured this piece of old flume and found that its capacity was different or more than the estimate made by the engineer, but there is much testimony in a general way to the effect that plaintiffs' ranch required, and that as prior appropriators they used in its irrigation through their upper ditch, as much water, estimated by the capacity of the flume back of Bowers' Mansion, as they have been allowed by the judgment.

Also, the testimony of farmers living in the vicinity, regarding the quantity of water required for the irrigation of the crops raised by plaintiffs, and the relative capacities of the square flume back of the mansion and the V flume being shown by actual flow of water to be different from the measurements of the engineer, may be considered as standing against his estimate and as supporting the judgment of the district court. Under the law and the specific terms of the decree as it has been directed to be modified, the allowance of a prior right to plaintiffs for one hundred and eighty-four inches is limited to such times as that quantity, by reasonable and economical use, is necessary for the irrigation of their lands, and when they do not need it they are not privileged to waste water to the detriment of the defend-

ants, who may then use any water in excess of plaintiffs' necessities.

It is ordered that Mrs. Nettie M. Gregory, Lewis W. Winters, Archie C. Winters, Mrs. Theodora Longabaugh, and Nevada Winters be substituted as defendants in place of Theodore Winters, deceased, and, if any other person or persons are interested in the judgment or property, they may be added as parties by the district court upon proper showing.

The judgment of this court as heretofore rendered will stand affirmed, and, the plaintiffs having already filed their consent, the district court will modify its judgment as we have directed.

NORCROSS, J.: I concur.

This case was submitted on rehearing before SWEENEY, J., became a member of the court.